IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 14, 2026 Session



# IN RE ELIJAH S.

**Appeal from the Chancery Court for Shelby County**
**No. CH-20-0853-2  James R. Newsom, Chancellor**

_____

## No. W2025-01170-COA-R3-PT

_____

Mother/Appellant appeals the trial court's termination of her parental rights on the ground of severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4), and on its finding that termination of Mother's parental rights is in the child's best interest.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

ROY B. MORGAN, JR., SR. J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and VALERIE L. SMITH, JJ., joined.

Laura L. English, Memphis, Tennessee, for the co-appellant, Tarrinae L. R.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the co-appellant, Tennessee Department of Children's Services.[2]

Kevin W. Weaver and Meredith Brasfield, Cordova, Tennessee, for the appellee, Hannah J. H.

## OPINION

### I. Background

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

[2] By order of February 3, 2026, this Court designated Tarrinae L.R. and The Tennessee Department of Children's Services as co-appellants.

Elijah S., III (the "Child") was born in February 2017 to Appellant Tarrinae L.R. ("Mother") and Elijah S., II ("Father"),[3] who were never married. This custodial episode began on or around April 1, 2017, when Mother noticed that the Child's leg was swollen, and he was crying when she picked him up to feed him. Mother called 911, and first responders examined the Child but did not take him to the hospital at that time. Mother later reported to DCS that Father and Father's uncle were present at the home when she discovered the Child's swollen leg. When the Child's leg was still swollen on April 2, 2017, Mother called the ambulance again, and the Child was taken to LeBonheur. On examination, the Child had two cuts on his foot, bug bites, and multiple bruises. He was sent home with Mother and Father. However, Mother returned to LeBonheur with the Child two days later on April 4, 2017. During the second visit, doctors discovered that the Child suffered a "clean" fracture of his femur. The Child was admitted to the hospital, and referral was made to the Tennessee Department of Children's Services ("DCS"). The referral stated that the family offered no explanation as to how the fracture occurred. On April 6, 2017, the Child was released to his maternal great-grandmother's care under an Immediate Protection Agreement ("IPA").

DCS conducted its first Child and Family Team Meeting ("CFTM") meeting on April 11, 2017. Trial Exhibit 5 is the summary of the April 11th CFTM meeting, wherein DCS notes that: "The parents confirmed that despite the allegations of domestic violence, there are no concerns regarding domestic violence in their relationship." Relying, in part, on this statement, the IPA was dissolved, and the Child was returned to Mother's custody. However, during a follow-up appointment on April 13, 2017, the Child's physicians determined that he had suffered additional injuries as described below. In view of this information, a second IPA was completed, and DCS placed the Child in the custody of his paternal great-grandmother. At a CFTM meeting on April 18, 2017, Mother denied harming the Child or allowing anyone else to do so. However, the summary of the April 18th CFTM meeting (i.e., Trial Exhibit 6), indicates that "Elijah's Physician [confirmed, to his great-grandmother] that [the Child's] injuries reflect physical abuse."

On April 25, 2017, DCS filed a petition to adjudicate dependency and neglect in the Shelby County Juvenile Court ("juvenile court"). Therein, DCS detailed the Child's injuries:

> According to the consultation for the Le Bonheur's CARES Program, the [C]hild has a right femur fracture, a bucket handle fracture to the right tibial metaphysis, and bruising to the back, face, and right lower extremities with no history. The injuries are reported as concerning for nonaccidental trauma. Upon the [C]hild's readmission to the hospital, the program completed a

---

[3] Father's parental rights to the Child were terminated in the same order as Mother's. He does not appeal.

second consultation. The osseous survey revealed a tibial shaft fracture, a femoral shaft fracture, metaphyseal corner fractures of the distal right femur and right tibia, proximal lateral metaphyseal fracture of the proximal right tibia, a proximal transmetaphyseal fracture of the right fibula and metaphyseal corner fracture of the distal left tibia with no history of trauma.

On April 25, 2017, the juvenile court entered an ex-parte protective custody order placing the Child with his paternal great-grandmother. On April 27, 2017, the juvenile court appointed counsel to represent Mother; on the same day, it appointed a guardian ad litem for the Child. Following a preliminary hearing on May 18, 2017, the juvenile court continued the custody arrangement and granted Mother supervised visits. However, on May 25, 2017, the juvenile court removed the Child from the paternal great-grandmother's custody due, *inter alia,* to allegations that paternal great-grandmother denied Mother visits with the Child. The juvenile court placed the Child with Hannah J. H. ("Foster Mother," and together with DCS, "Appellees"),[4] where he has resided since that time.

Following a two-day hearing, the juvenile court adjudicated the Child to be dependent and neglected by order of March 29, 2018. In this initial adjudicatory order, the juvenile court found, by clear and convincing evidence, that the Child was a victim of severe abuse perpetrated by Mother. However, in an "Amended Adjudicatory/Dispositional Order" entered on June 5, 2018, the juvenile court removed its previous finding that Mother was the perpetrator of the abuse and found that the perpetrator was "unknown," *see further discussion infra*. Custody of the Child remained with DCS.

Despite DCS' ongoing concerns with domestic violence between Mother and Father, *see discussion infra*, during the custodial episode, Mother's visits with the Child increased. From July 2017 through March 2019, her visits were supervised and limited to two, two-hour visits per month. From March 2019 until June 15, 2020, the visits remained supervised but were increased to every Sunday for three hours. On or about June 16, 2020, the juvenile court granted DCS' motion to grant unsupervised visitation. These visits were scheduled for the first, third, and fifth weekends of each month.

DCS also worked with Mother to develop nine Family Permanency Plans during the pendency of this case. All of the plans were ratified, and Mother has been compliant with the majority of the requirements outlined therein. At the time of the hearing on the petition to terminate her parental rights, Mother had obtained her high school diploma, completed a Job Corps program, and enrolled in college to become a radiology technician. At the time of trial, Mother was living (with her three other children) in her brother's home.

---

[4] In June 2023, Foster Mother married her husband, Terrance S. Prior to the marriage, Foster Mother adopted another child, Noah, age 6. Foster Mother and Terrance S. are also the parents of a biological child, who was 1 at the time of the hearing on the petition to terminate Mother's parental rights. These two children reside in the foster home with Elijah.

On July 17, 2020, shortly after Mother was granted unsupervised visits, Foster Mother filed a Petition for Adoption and Termination of Parental Rights in the Shelby County Chancery Court ("trial court"). Foster Mother alleged several grounds for termination of Mother's parental rights, including: (1) abandonment by failure to support; (2) abandonment by failure to provide suitable housing; (3) persistence of the conditions that led to the Child's removal; (4) substantial non-compliance with the requirements of the permanency plans; (5) failure to manifest an ability and willingness to assume custody; and (6) severe child abuse. On August 14, 2020, DCS filed an answer, wherein it denied that grounds existed and that termination of Mother's parental rights was in the Child's best interest. Mother filed an answer in opposition to the petition.

Trial was initially set for October 6, 2021, but it was continued several times. Delays were caused by the death of the initial guardian ad litem and a change in Mother's attorney. The case was then transferred from Chancellor Jim Kyle to Chancellor James R. Newsom, III, who heard the petition on April 15, 16, and 17, 2025. By order of July 8, 2025, the trial court terminated Mother's parental rights on the sole ground of severe child abuse (the court found that Foster Mother failed to meet her burden of proof as to the other grounds asserted in the petition). The trial court also found that termination of Mother's parental rights is in the Child's best interest. Mother filed a timely notice of appeal on August 4, 2025.

## II. Issues

Mother raises two issues for review as stated in her brief:

I. The trial court erred by finding that there is clear and convincing evidence that Mother has committed severe child abuse against Elijah.
II. The trial court erred by finding that there is clear and convincing evidence that termination of Mother's parental rights is in Elijah's best interest.

In addition, Foster Mother raises the following issue as stated in her brief:

The trial court erred by not finding clear and convincing evidence that Mother abandoned Elijah by failing to provide support or reasonable payments of support for him in the four months prior to the filing of the Petition for Adoption and Termination of Parental Rights, pursuant to Tennessee Code Annotated § 36-1-113(g)(1).

## III. Standard of Review

We review the trial court's findings of fact *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). However, "[i]n light of the heightened burden of proof in termination

- 4 -

proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* When the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it. *Id.* The trial court's conclusion that clear and convincing evidence supports grounds for termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524. Whether the trial court's factual findings amount to clear and convincing evidence that termination is in the child's best interest also is a question of law that we review *de novo* with no presumption of correctness. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

## IV. Grounds for Termination of Mother's Parental Rights

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522-23 (footnote omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in Tennessee. *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). The version of the statute in effect on the date the petition was filed is the applicable version. *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). At the time Foster Mother filed her petition to terminate Mother's parental rights, the statute provided, in relevant part:

(c) Termination of parental or guardianship rights must be based upon:
(1) A finding by the court by clear and convincing evidence that the grounds

- 5 -

for termination of parental or guardianship rights have been established; and (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Accordingly, the trial court is required "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[ ]" and, if so, whether termination of the parent's rights is in the child's best interest. *In re Emarie E.*, No. E2022-01015-COA-R3-PT, 2023 WL 3619594, at *3 (Tenn. Ct. App. May 24, 2023) (quoting *In re Donna E.W.*, No. M2013-02856-COA-R3PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014)). With the foregoing in mind, we turn to review the trial court's findings.

## A. Severe Child Abuse

The petition to terminate Mother's parental rights was filed on July 17, 2020. At that time, Tennessee Code Annotated section 36-1-113(g)(4) provided a ground for termination of parental rights when:

> The parent or guardian has been found to have committed severe child abuse, as defined in §37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child.

The version of Tennessee Code Annotated section 37-1-102 in effect at the time the petition was filed defined "severe child abuse," in relevant part, as follows:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in §39-15-402(c)[.]
>
> ***
>
> (C) The commission of an act toward the child prohibited by . . .§ 39-15-402 . . . .

Tenn. Code Ann. § 37-1-102(b)(27) (eff. July 2020).[5] As this Court has explained:

---

[5] This definition is now codified at Tennessee Code Annotated section 37-1-102(b)(28).

[T]his ground for termination provides two different "avenues for a finding of severe child abuse." ***In re Anna B.***, No. M2016-00694-COA-R3-PT, 2017 WL 436510, at \*4 (Tenn. Ct. App. Feb. 1, 2017). The severe abuse finding may have already been made in a "prior order of a court," or, in the alternative, the finding may be made "by the court hearing the petition to terminate parental rights or the petition for adoption." *See* Tenn. Code Ann. § 36-1-113(g)(4); ***In re Anna B.***, 2017 WL 436510, at \*4. Thus, "'[a]s the statute makes clear, the finding of severe abuse can be based on a prior court order or on evidence of 'severe child abuse' submitted to the court hearing the termination case.'" ***In re Brianna T.***, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at \*4 (Tenn. Ct. App. Dec. 22, 2017).

***In re Avery H.***, No. W2024-01763-COA-R3-PT, 2026 WL 145669, at \*8 (Tenn. Ct. App. Jan. 20, 2026). Here, the trial court considered both "avenues" for a finding of severe child abuse. First, the trial court considered whether the juvenile court's June 5, 2018 "Amended Adjudicatory/Dispositional Order" constituted a "prior court order," under which Mother "has been found to have committed severe child abuse." Tenn. Code Ann. § 36-1-113(g)(4). In the amended dependency and neglect order, the juvenile court found that

> there is clear and convincing evidence that the [C]hild . . . is the victim of severe child abuse pursuant to Tenn. Code Ann. §37-1-102(b)(22)(A) in that the [C]hild suffered from abuse or neglect causing serious bodily injury. The injuries involved numerous fractures of the infant's bones, including a thigh bone, elevated liver enzymes, which signify blunt force trauma. The perpetrator of the abuse is unknown.

In considering whether the juvenile court's order was res judicata on the question of severe child abuse in the context of the termination of parental rights proceedings, the trial court held:

> 49. Here, the order of the Juvenile Court states "[t]he perpetrator of the abuse is unknown." This finding is not entitled to res judicata effect in this Court because the issue was not fully litigated at the Juvenile Court dependency and neglect hearing and there is new evidence that the Court may consider. . . .
> 50. . . [T]he Juvenile Court here did not make an explicit finding that either or both [Father and Mother] was, or was not, the perpetrator of abuse, *i.e.*, the perpetrator could have been one, or both, of the parents involved in the dependency and neglect hearing.
> 51. The finding made in the Juvenile Court Order was not fully litigated because the issue of who perpetrated the abuse was not actually resolved. Rather, the Juvenile Court only found that there was clear and convincing evidence that Elijah was a victim of severe abuse. Because the

issue of who perpetrated the abuse was unresolved by the Juvenile Court, this Court may consider facts on this record to examine this issue.

The trial court's ruling is correct. In ***Avery H.***, this Court explained:

> We begin by examining the prior order of the juvenile court regarding severe abuse. "A finding of severe abuse in dependency and neglect proceedings has serious ramifications . . . since a finding of severe abuse can serve as a ground for termination of parental rights." ***In re Kaliyah S.***, 455 S.W.3d at 537 n. 5 (citing ***In re Samaria S.***, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011)). In a termination of parental rights proceeding, the doctrine of res judicata prevents a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action. *See **In re I.E.A.***, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016) (citing ***In re Dakota C.R.***, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012)). Here, however, the order entered in the dependency and neglect proceeding stated, "The Court finds that the child is a victim of severe abuse but does not find the child was a victim of severe abuse perpetrated by the parents as the perpetrator cannot be identified." This ground for termination is established if "[t]he parent [] has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court . . . ." Tenn. Code Ann. § 36-1-113(g)(4). The dependency and neglect order in this case simply did not find that Mother committed severe child abuse.

***In re Avery H.***, 2026 WL 145669, at *8. The same is true here. Although the juvenile court found that the Child was the victim of severe child abuse, it did not find that Mother was the perpetrator.

Having correctly determined that the first avenue for a finding of severe child abuse, *i.e.* a previous order finding that the parent was the perpetrator of the abuse, was not available, the trial court proceeded along the second avenue, which allows a finding of severe child abuse to be made "by the court hearing the petition to terminate parental rights or the petition for adoption." Tenn. Code Ann. § 36-1-113(g)(4); ***In re Avery H.***, 2026 WL 145669, at *8 (citing ***In re Anna B.***, 2017 WL 436510, at *4); ***In re Dilmer S.M.***, No. W2024-00632-COA-R3-PT, 2025 WL 238861 at *9 (Tenn. Ct. App. Jan. 17, 2025) (Usman, J., concurring). As set out above, under Tennessee Code Annotated section 37-1-102(b)(27)(A)(i), the knowing failure to protect a child from "serious bodily injury" may result in a finding of severe child abuse. As relevant here, Tennessee Code Annotated section 39-15-402(c) defines "serious bodily injury" to include "a fracture of any bone." Alternatively, under section 37-1-102(b)(27)(C), severe child abuse may be found where a person commits "an act toward the child prohibited by . . . § 39-15-402." Section 39-15-402(a) provides, in relevant part that, "A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child

abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and: (1) The act of abuse, neglect or endangerment results in serious bodily injury to the child." As referenced in section 39-15-402(a), sections 39-15-401(a) through (c) provide:

> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class E felony; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony.
> (b) Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.
> (c)(1)(A) A parent or custodian of a child eight (8) years of age or less commits child endangerment who knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child.
>
> (B) For purposes of this subsection (c):
>
> (i) "Imminent danger" means the existence of any condition or practice that could reasonably be expected to cause death or serious bodily injury;
> (ii) "Knowingly" means the person knew, or should have known upon a reasonable inquiry, that abuse to or neglect of the child would occur which would result in physical injury to the child. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary parent or legal custodian of a child eight (8) years of age or less would exercise under all the circumstances as viewed from the defendant's standpoint . . . .

Tenn. Code Ann. §§ 39-15-401(a)-(c). From the statutory scheme, the Tennessee Supreme Court has concluded that

> "Severe abuse" encompasses two different forms of severe child abuse, both equally culpable. One involves commission and the other involves omission. The commission form is defined as "exposure of a child" to "abuse or neglect that is likely to cause serious injury or death," or the "use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). The omission form is defined as "failure to protect a child" from such abuse, neglect, or use of force. *Id*. Severe child abuse can be either or both.

***In re Markus E.***, 671 S.W.3d 437, 465 (Tenn. 2023) (footnote omitted). No matter whether

a finding of severe child abuse is predicated on the exposure of the child to abuse likely to cause serious bodily injury or on the failure to protect the child from same, "[t]he state of mind associated with severe child abuse as defined in section 37-1-102(b)(22)(A)(i) is 'knowing.'" *Id.* at 460 (citing Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016)) (footnote omitted). Noting that "[t]he statutes do not define 'knowing,'" the *Markus E.* Court proceeded to grapple with the definition of that term. We quote extensively from their analysis:

> In interpreting this term, [*i.e.* knowing] we are mindful that "[t]he text of the statute is of primary importance." *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 839 (Tenn. 2019) (quoting *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012)). The words in the statute "must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Id*. (quoting *Mills*, 360 S.W.3d at 368). We consider "the language of the statute, . . . the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Spires v. Simpson*, 539 S.W.3d 134, 143 (Tenn. 2017) (quoting *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005)). Our construction must be reasonable in light of the statute's purposes and objectives. *Beard v. Branson*, 528 S.W.3d 487, 496 (Tenn. 2017) (quoting *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995)).
>
> Viewing the severe child abuse provision in context, we note that other grounds for termination of parental rights have historically required a showing of a different state of mind, for example, that the parent's act or failure to act was "willful." *See, e.g.*, Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2016) (requiring a showing that the parent "willfully" failed to visit or "willfully" failed to support the child). The Court interpreted willfulness to require a showing that the parent had the ability to visit or support, and implied a certain amount of intentionality. *See, e.g.*, *In re Adoption of A.M.H.*, 215 S.W.3d [793,] at 810 [(Tenn. 2007)] (holding that the evidence on the parents' failure to visit did not "support a finding that the parents intentionally abandoned" the child); *see also* Willful, Black's Law Dictionary (11th ed. 2019) ("Voluntary and intentional, but not necessarily malicious"). In contrast, the term "knowing" does not require proof the parent intended for the child to suffer abuse or neglect, but instead focuses on the parent's awareness of relevant facts. *See, e.g.*, *Knowing, Black's Law Dictionary* (11th ed. 2019) ("Having or showing awareness or understanding; well-informed").
>
> If the term "knowing" indicates awareness, the question is, awareness of what? Our answer to that question must be consonant with the words that surround "knowing" in the statute. *See Wallace v. Metro. Gov't of Nashville*, 546 S.W.3d 47, 52 (Tenn. 2018) ("[B]ecause 'words are known by the company they keep,' we construe them in the context in which they appear .

. . .") (quoting ***Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 526 (Tenn. 2010))); ***United States v. Taylor***, [596] U.S. [845], 142 S. Ct. 2015, 2023, 213 L.Ed.2d 349 (2022) (rejecting an overly abstract definition of the word "threat" based on "our usual rule of statutory interpretation that a law's terms are best understood by 'the company [they] kee[p].'" (alterations in original) (quoting ***Gustafson v. Alloyd Co.***, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995))).

Here, the statute uses "knowing" as part of the phrase "knowing failure to protect a child from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). While it surely includes actual awareness of abuse or neglect that has occurred, the phrase "knowing failure to protect a child from abuse or neglect" is not limited to that. The term "protect" means to "defend or guard against injury or danger" and to "keep safe." *Protect, Shorter Oxford English Dictionary* (6th ed. 2007) (Oxford University Press) (emphasis added). Thus, "protect" includes not only defending but also guarding against danger, *i.e.*, risk of future injury. The phrase "failure to protect" is forward-looking; in family law, it means the "refusal or inability of a parent or guardian to prevent abuse of a child under his or her care." *Failure (failure to protect), Black's Law Dictionary* (11th ed. 2019) (emphasis added). Thus, the term "knowing" as used in "knowing failure to protect a child from abuse or neglect" must include not only awareness of abuse or neglect that has occurred, but also awareness of facts, circumstances, or information indicating that the child is at risk or in danger of suffering abuse or neglect.

In the context of parental termination cases, our Court of Appeals has discussed how the term "knowing" should be interpreted:

> It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." . . .
>
> "[K]nowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury:
>
> The term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute. . . . [T]he term has been described as follows:
>
>> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard

- 11 -

of the information that has been presented to him
or her.

*In re S.J.*, 387 S.W.3d [576,] at 592 [(Tenn. Ct. App. 2012)] (quoting *In re Samaria S.*, 347 S.W.3d [188,] at 206 [(Tenn. Ct. App. 2011)]) (emphasis and internal citations omitted). "Persons act 'knowingly' when they have specific reason to know the relevant facts and circumstances but deliberately ignore them." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at \*7 (Tenn. Ct. App. July 13, 2004); *see also In re H.L.F.*, 297 S.W.3d 223, 237 (Tenn. Ct. App. 2009) ("By deliberately and recklessly ignoring Father's pedophilic interests, Mother knowingly failed to protect Heather from being raped by Father. . . .").

This interpretation of "knowing" traces back to *In re R.C.P.*, 2004 WL 1567122 at \*7, in which then-Judge Koch adopted a definition articulated by the West Virginia Supreme Court in *West Va. Dep't. of Health & Hum. Res. ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). The West Virginia court explained that the statutory term "knowingly" as used in the West Virginia definition of child abuse "does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse occurred." *Id.* at 878-79. Thus, the evidence is generally required to show the parent was presented with facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the child. *See id*. *See also R.S. v. Dep't of Child.*, 831 So. 2d 1275, 1278 (Fla. Dist. Ct. App. 2002) ("In order for the father to have failed to protect, there must have been evidence that he had the capability to prevent the abuse. This by necessity requires proof that he knew or should have known of the mother's conduct and resulting injury to" the child); *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App. 2019) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards.").

Applying Tennessee's severe child abuse statute, our intermediate appellate court has found "knowing" failure to protect even absent proof that the parent was actually aware that abuse or neglect had occurred. Under this standard, the requisite awareness is of facts, circumstances, or information that would have triggered a reasonable parent's duty to take affirmative action to protect the child from abuse or neglect. If the parent has been presented with such facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing. *See, e.g., In re Samaria S.*, 347 S.W.3d at 206-07 (proof supported finding that intellectually-challenged mother had enough ability to recognize the importance of facts presented to her and appreciate the risk of abuse or neglect to her children, and thus supported finding that her neglect was

- 12 -

knowing); ***In re Aleksandree M.M.***, No. M2010-01084-COA-R3-PT, 2010 WL 3749423, at *3 (Tenn. Ct. App. Sept. 27, 2010) (while there was no evidence the mother saw the boyfriend's sexual abuse of daughter, proof showed mother ignored risk implicit in incidents such as her boyfriend's lewd comments about young girls in mother's presence, and his request for permission to "court" mother's daughter); ***In re Estrella A.***, No. M2022-00163-COA-R3-PT, 2022 WL 17091958, at *7 (Tenn. Ct. App. Nov. 21, 2022) (mother had been abused by her own father, knew his propensity toward sexual abuse, was warned to prohibit contact between maternal grandfather and her children, and yet still lived with children in sister's home with grandfather and exposed children to risk of abuse).

Similarly, a parent's failure to protect can be considered knowing if the parent was deliberately ignorant, as where the parent avoids actual knowledge of the abuse or neglect but is aware of facts, circumstances, or information that would put a reasonable parent on notice of the risk and the need to protect the child. *See, e.g.,* ***In re Tamera W.***, 515 S.W.3d 860, 875 (Tenn. Ct. App. 2016) (father would often leave the home when mother began beating children); ***In re S.J.***, 387 S.W.3d at 593 (mother ignored admonition by healthcare provider that infant was underweight and needed to be examined by a physician, did not take the child to be seen by a physician, and continued to starve the child); ***In re Caleb J.B.W***., No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *6 (Tenn. Ct. App. July 14, 2010) (when mother noticed child's injuries after leaving him in care of her boyfriend, she chose to believe her boyfriend's explanation that child fell while they were playing).

An additional consideration counsels in favor of adopting the Court of Appeals' longstanding interpretation of "knowing"—the prior-construction canon. Under this canon, "[i]f a word or phrase [in a statute] has been authoritatively interpreted by the highest court in a jurisdiction, or has been given a uniform interpretation by inferior courts or the responsible agency, a later version of that act perpetuating the wording is presumed to carry forward that interpretation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012) (Reading Law). In that circumstance, the word or phrase "has acquired . . . a technical legal sense . . . that should be given effect in the construction of later-enacted statutes." *Id*. at 324.33 The prior-construction canon is well accepted in Tennessee. *See, e.g.,* ***Walker v. Bobbitt***, 114 Tenn. 700, 88 S.W. 327, 329 (1905) ("It is a rule well established, and perhaps universally accepted by courts and text-writers, that where a statute has received a judicial interpretation, and it is re-enacted, it will be presumed the Legislature intended it should have the same construction which was given to the earlier statute."); ***Miller v. Kennedy***, 164 Tenn. 470, 51 S.W.2d 1000, 1002 (1932) ("The rule is sometimes stated that the judicial construction which had

- 13 -

theretofore been placed upon a statute forms a part of the re-enactment.").

Tennessee's statute on severe child abuse has included "knowing failure to protect" since the late 1970s. The Court of Appeals adopted the prevailing definition of "knowing" in its 2004 decision in *In re R.C.P.*, and since then the intermediate appellate court has consistently applied that interpretation of the term. In 2011, the General Assembly amended the definition of "severe child abuse" to its current form. *See* Act of May 16, 2011, ch. 314, § 3, 2011 Tenn. Pub. Acts 756. It made only minor revisions not pertinent here, and left intact the phrases "knowing exposure" and "knowing failure to protect." And it did so after the Court of Appeals had issued at least eight opinions interpreting "knowing" in a uniform manner. This is "significant enough" for the bar to "justifiably regard the point as settled law." *Reading Law*, at 325. These circumstances are a textbook example for application of the prior-construction canon. It further supports adoption of the Court of Appeals' well-established interpretation.

Thus, the Court of Appeals' interpretation of the term "knowing," as used in the statutory definition of severe child abuse in Tennessee Code Annotated section 37-1-102(b), aligns with the text, purposes, and objectives of the statute, and it is "based on good sound reasoning." *Beard*, 528 S.W.3d at 496 (quoting *Scott v. Ashland Healthcare Ctr., Inc*., 49 S.W.3d 281, 286 (Tenn. 2001)). Under the prior-construction canon, we may presume that our legislature, by re-enacting the statute in 2011 without changing the language at issue here, "intended it should have the same construction which was given to the earlier statute" by our Court of Appeals. *Walker*, 88 S.W. at 329. This interpretation comports with our directive to construe statutes "with the saving grace of common sense." *State ex rel. Maner v. Leech*, 588 S.W.2d 534, 540 (Tenn. 1979).

Accordingly, we agree with the Court of Appeals and hold that, in the context of severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when "he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *In re S.J.*, 387 S.W.3d at 592 (citing *In re R.C.P.*, 2004 WL 1567122, at *7). Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child. For deliberate ignorance, persons can be found to have acted knowingly "when they have specific reason to know" the relevant facts, circumstances, or information "but deliberately ignore them." *In re R.C.P.*, 2004 WL 1567122, at *7. For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered "knowing."

*In re Markus E.*, 671 S.W.3d at 460-465 (footnotes omitted).

With the foregoing in mind, we turn to review the trial court's findings of fact and conclusions of law regarding the ground of severe child abuse. As set out in its order terminating Mother's parental rights:

17. Ms. Jane Cain, a DCS Child Protective Services Supervisor, testified at trial regarding DCS' investigation into the allegations of physical abuse against Elijah. She testified that on June 7, 2017, a DCS team concluded that the allegations of physical abuse against Elijah had been proven to be true and that [Mother] had been proven to be the perpetrator of the abuse.
18. Ms. Cain testified that the DCS team's conclusion regarding the allegations of physical abuse was based on the medical records received from LeBonheur's CARES team. DCS regularly receives reports from the LeBonheur CARES team. The DCS team relies on its documentation.
19. Ms. Cain testified that the DCS team based its conclusion that [Mother] was the perpetrator of Elijah's physical abuse mainly upon an electronic message [Father] sent [Mother] on Facebook accusing her of breaking Elijah's leg—and [Mother's] subsequent failure to deny [Father's] assertion.
20. Also, in the same message, which followed the involvement of DCS on Elijah's behalf, [Father] stated that he wished that Elijah would have succumbed to his injuries. Moreover, he stated that every time he was around Elijah, he wished to kill him and offered to do so "for free," in gang parlance.
21. The text of the exchange reads as follows:

[Father]: But FTS [Fuck That Shit] it Seem Like you Against Me Or Some [something], So We Gone Just Say Leave It Alone.
[Mother]: Do what I said [laughing emoji] an idc [I don't care] what U think dude u against me
[Father]: Lol [Laugh out loud] Fuck Elijah & Them Rights Really I Hope Foster Care Keep His Ass [laughing emoji] I Got One Son & Finna [fixing to] Make a Daughter, I Wish He Would've Died From you Breaking His Leg, But YEAH THO KEEP ME OUT YO LIFE FUCK YO KIDS Every time I Get Around Him I Be Wanting too Kill Him Its Just That Supervised Shit Folks Around & Shit, But I'm Piru [a gang originating in Compton, California] Poppa Fuck The Price Too Do it I'll Kill Yo Son For Free Just Cause The mistake Look Like Me But Its That LEAVE ME ALONE

No record of a response by [Mother] to [Father's] statement, if any there was, was introduced at trial. However, [Mother] was examined on the issues raised

- 15 -

by this Facebook exchange between [Father] and [Mother] at trial. The Court found [Mother's] account not to be credible when she asserted that she did not believe that [Father] had demonstrated dangerous propensities toward Elijah.

22. On cross-examination, Ms. Cain testified that she did not consider [Father's] statements about harming Elijah, which subsequently led to a No-Contact Order against [Father], in her role as a member of the DCS team in "substantiat[ing]" [Mother] as the perpetrator of the abuse.

23. Ms. Cain further testified that she was not aware in June 2017 that [Mother] had been a victim of domestic violence by [Father], nor did she consider that [Father's] violence against [Mother] might impact her ability to respond to [Father's] accusations due to fear.

24. The Court rejects the attempted impeachment of Ms. Cain's testimony as to her basis for substantiating [Mother] as the "primary" perpetrator of Elijah's injuries. Based on her demeanor at trial, the Court finds that [Mother] was not credible when she disclaimed all responsibility for Elijah's injuries—whether it was she or [Father] who inflicted the injuries. Even were it [Father] who inflicted Elijah's injuries, [Mother] failed to protect Elijah as an infant who was little more than one month old at the time that he sustained the savage injuries that befell him. The conclusion of [] Ms. Cain's experienced DCS team based on the evidence available to it a little more than two months after Elijah's injuries is entitled to significant weight. Moreover, the on-line dialogue between [Mother] and [Father] does not reflect that [Mother] had been silenced by intimidation to such an extent that she was afraid to respond to his accusations. ("Do what I said [laughing emoji] an idc what U think dude u against me").

***

40. Elijah's injuries were inflicted on him while he was in the physical custody of either [Father] or both [Mother] and [Father]. The Court finds no factual basis to conclude that the perpetrator(s) of Elijah's injuries were "unknown."

41. [Mother] testified that [Father] was physically abusive toward her throughout their relationship, including acts of abuse prior to [Mother's] pregnancy with Elijah. [Father's] acts of abuse toward [Mother] prior to her pregnancy with Elijah included his beating her with a belt, choking her, and holding a gun to her head.

42. [Mother] testified that [Father] was a member of a gang during his relationship with [Mother].

43. [Mother] testified that she did not have any safety concerns about [Father] being around Elijah and she took no precautions to protect Elijah. The Court concludes from its observation of her testimony that [Mother's] testimony is

not credible.

44. On June 8, 2017, DCS "substantiated" that the physical injuries sustained by Elijah were perpetrated by [Mother].

\*\*\*

98. The Court finds by clear and convincing evidence that [Father] was a person of violent and unrestrained brutal intent and action, particularly toward Elijah, whom he objectified and against whom he expressed a death wish. Further, the Court finds by clear and convincing evidence [Mother] continued in her relationship with [Father] with full knowledge of his violent and unrestrained brutal intent toward Elijah, thereby exposing Elijah to the risk of physical abuse by [Father]. Moreover, even after Elijah's foster placement with [Foster Mother], [Mother] continued herself to be involved in gang activity, exhibiting violence. After completing classes offered by DCS, [Mother] persisted in her relationship with [Father]—even though DCS requested that she cut off that relationship. Contemporaneous parenting assessments conducted by DCS showed that [Mother] could not properly parent Elijah. She lacked the capacity to care for Elijah's basic needs while those needs were being met by [Foster Mother]. Even further, DCS evaluated [Mother] as having a high "Abuse Scale," "indicating that she was a person who could be physically abusive to her children." Thus the Court finds by clear and convincing evidence that [Mother], while not the "primary" perpetrator of Elijah's injuries, was complicit in exposing Elijah to the physical brutality that he suffered, together with the trauma that Elijah continued to experience long after he recovered from the savage physical wounds that he received. The Court considers the young age of [Mother] at that time, but in the final analysis, finds her conduct to be unnatural and less than is reasonably expected of a mother, who should have the instinct to protect her child from severe and life-threatening abuse, such as is evident here.

Turning to the record, there can be no doubt that, throughout these proceedings, DCS has had concerns regarding domestic violence between Mother and Father. For example, on June 2, 2017, DCS filed an emergency petition in the juvenile court, asking it to order no contact between the parents and the Child. As set out in its emergency petition, DCS was concerned over the text-message exchange between Father and Mother, *see trial court's order supra*. Then, in the first Family Permanency Plan, dated June 14, 2017, DCS noted the following concern:

According to reports, [Mother and Father] are affiliated with gangs, and they participate in gang activities. [Mother and Father] need an Anger Management Assessment in order to address concerns as it relates to anger

- 17 -

and aggressive behaviors . . . .

DCS also noted concern that Mother was using illegal drugs.[6]

In the permanency plan entered on June 4, 2018, DCS reiterated the foregoing concerns and also noted that:

[Mother] reported that [Father] beat her with a belt, choked her, and held a gun to her head. However, [Mother] gave birth to a baby girl with [Father] in 2018.[7] It was recommended that [Mother] continue Individual Counseling and seek Domestic Violence Counseling to help and understand the cycle of domestic abuse. [Father] denied these allegations.

Based on these concerns, DCS required Mother to submit to a "Parenting Capacity Assessment," which included a Parenting Stress Index (PSI), Child Abuse Potential Inventory (CAP), and a clinical interview. The assessment, which was conducted on June 30, 2017, revealed the following:

[Mother] completed two structured measures relative to personal functioning and parenting. There were no validity issues with the Child Abuse Potential Inventory (CAP) or the Parenting Stress Index (PSI) indicating that results are an accurate assessment of [Mother's] current functioning. **The Abuse Scale score of the CAP was elevated indicating that [Mother] produced a protocol consistent with that of person known to be physically abusive to their children**. Three of the six subscales compromising the Abuse Score were also elevated. There was indication of problems in [Mother's] functioning personally, interpersonally, and as a parent. The Rigidity scale was elevated, indicating that [Mother] has strict beliefs regarding the attitudes and behaviors of children. She is at risk of using overly harsh disciplinary strategies if and when her expectations are not met.

(Emphasis in original). In addition to the parenting assessment, the trial court also considered DCS' internal "Severe Abuse Review," wherein DCS noted:

The mother . . . continues to report that she doesn't know how the [C]hild got injured. There were Facebook messages between the [M]other and [F]ather where the [F]ather blamed the [M]other for the broken leg and

---

[6] In the permanency plan dated April 6, 2020, DCS noted that Mother "received an Alcohol and Drug Assessment. She tested positive for marijuana."

[7] At the time of the hearing on the petition to terminate her parental rights, Mother had four children (including Elijah). Mother's three other children live with her, and DCS has not received any referrals regarding these children.

also stated that he would kill the [C]hild. The [M]other never refuted the allegations that she broke his leg on Facebook.

[Mother] was a minor mother still living in the home with her mother at the time of removal. She was involved in a domestic violent relationship with her baby's Father and was involved in gang activity. There [was evidence] of the [M]other still engaging in a violent relationship with the [F]ather in 2017. It was requested that she refrain from having a relationship with him and completed domestic violence classes. She completed the classes, however, remained in a relationship with him and even had another baby with him.

As set out in its order, the trial court also heard testimony from Jane Cain, a DCS Team Leader and Child Protective Services Investigator. Ms. Cain testified that DCS "did substantiate the allegation of physical abuse [against the Child]." She further explained that, after reviewing the Child's medical records, other information DCS gathered during its initial investigation, and consulting with the DCS team, which includes a Memphis police officer, a Shelby County sheriff, an assistant district attorney, a Child Advocacy Center representative, and members of the DCS team assigned to the case, Ms. Cain testified that DCS made the following determinations:

Q. Okay. In this report . . . we have the alleged perpetrator named as [Mother] correct?
A. Correct.
Q. And if we drop down, . . . it says, "CPS classification decision." And we have the acronym A-S-P-S. What does that stand for?
A. Allegations substantiated perpetrator substantiated.
Q. And what does that mean?
A. It means that the allegation of physical abuse was proved to be true. And the perpetrator, [Mother], was proven that it was her, that we had evidence to substantiate that.

\*\*\*

Q. Okay. And so it's my understanding that this group [*i.e.*, the DCS team] would have spent time reviewing what you discussed, as far as documents you looked at; correct? Y'all did that—
A. Correct.

\*\*\*

Q. Okay. Now, you mentioned that you looked at medical records. Do you remember what else, as far as to this specific case that you would have looked at?

A. The medical records from the CARES team was [sic] our main form of evidence. The CARES team at LeBonheur. . . .

Q. . . . [Y]ou testified about the records and all. But as far as the factors in terms of making that decision as to [Mother] being the perpetrator?

A. We based our decision on the CARES report. We also had text messages that we received that we had from [Mother] herself wherein it states that she was the one who broke Elijahs leg . . .

Q. . . . [Y]our testimony was that one of the things y'all looked at was these messages that were between [], the [F]ather, and [], the [M]other; correct?

A. Correct.

Q. Now, Ms. Cain, once this team review is completed, I noticed on page 2 everyone signed and dated it, June 8th of 2017. And, then, there was a[n] "agree" or "disagree" box to mark.

***

A. And, then, [the DCS team's report] went to our director to make a final decision. But that didn't happen in this case. Everybody agreed that it was substantiated.

On cross-examination, Ms. Cain conceded that the LeBonheur's CARES team report did not indicate the perpetrator of Elijah's injuries. However, Ms. Cain testified that the text exchange between Mother and Father led the DCS team to conclude that Mother was the perpetrator:

Q. And so you're taking your determination that [Mother] is the alleged perpetrator based on the statement of the [F]ather, who also had access to the [C]hild, because he said [Mother broke the Child's leg] in his text message. Is that correct?

A. That is partially correct. The other part of that is she never denied it. [Mother] [] did not say, "No, that's not true, I didn't break his leg."

Mother's attorney then intimated that Mother may have failed to defend herself in the text exchange because she feared Father:

Q. Because [Mother] didn't respond to a text message from a man who threatened to kill her son twice, that means she must have done it?

***

A. If somebody accuses you of something, most people say, "No, I didn't do it," or, "I did it," or they don't say anything at all. . . . [Mother] did not deny [Father's statement that she broke the Child's leg]. Most people, if they did

- 20 -

not do something, say, "Ug-huh, it wasn't me."

As noted by the trial court, Mother did reply to Father in the email exchange, stating, "Do what I said [laughing emoji] an idc [I don't care] what U think dude u against me." We agree with the trial court's conclusion that her reply does not indicate that Mother was afraid to respond to Father. Indeed, Mother was not so afraid of retaliation that she did not forward the entire text exchange to DCS, and she was not scared enough to end her relationship with Father.

Mother's own testimony justifies DCS' concerns and conclusions. First, Mother testified that she knew Father was involved in gang activity:

> Q: Now, [Mother], in the records that were produced by the Department there's some indication that there was concern about gang activity concerning you and [Father] early on, when the [C]hild first came into your care.
> A. Uh-huh.
> Q. Was [Father] a member of a gang?
> A. I mean, I guess so. . . . I mean, he probably was. . . . [Y]es, he was part of that gang. But I'm not a part of the gang.
> Q. I understand. Were you ever involved with that gang?
> A. No.
> Q. Okay. And was he involved with that gang at the time that you had your baby, had Elijah?
> A. Yeah.

By her own admission, Mother knew of Father's gang affiliation even before the Child was born. She also knew that Father had pending criminal charges even before the time of Elijah's injuries:

> Q. And at the time that you were pregnant with Elijah and up to the time that Elijah was removed from you, were you aware of any criminal record as far as [Father] goes?
> A. Yeah.
> Q. What were you aware of?
> A. I mean, I don't know exactly what he was charged with, I just know he was going back and forth to court.
> Q. He was going back and forth to Criminal Court or
> A. 201 [Poplar Avenue, Memphis], uh-huh. Yes.
>
> ***
>
> Q. Did it raise concerns with you that he was having to go back and forth to

- 21 -

Criminal Court? . . .

\*\*\*

A. No.

\*\*\*

Q. That didn't raise any concerns for you?
A. No.
Q. No safety concerns for Elijah?
A. No.
Q. So, it's your testimony that the time Elijah was born and the time these injuries occurred, you had no safety concerns about Elijah being around [Father]?
A. No. I didn't feel like he would hurt my child.

In addition to knowing that Father was involved in gang activity and that he incurred numerous criminal charges, Father's text messages provided clear notice to Mother that Father was a dangerous person capable of harming the Child. As set out in context in the trial court's order, *supra*, Father stated, "I Wish [the Child] Would've Died," and confessed that, "Every time I Get Around [the Child] I Be Wanting too [sic] Kill Him." Father then offered Mother the following: "I'll Kill Yo Son For Free Just Cause." Mother was concerned enough about this text exchange to forward it to DCS, yet she continued her relationship with Father and had another child with him approximately one year after Elijah was born:

Q [to Mother]. You had two children with [Father].
A. Exactly . . . . I got a daughter and son by him.
Q. And how old she?
A. She's 7.

\*\*\*

Q. How old was Elijah when your daughter was born?
A. He was one. She's 7; he's 8.
Q. Okay. All right. So, they're about a year difference?
A. Uh-huh.

The foregoing indicates that despite knowledge of his gang affiliation, his criminal record, the Child's significant injuries, and Father's threats to kill the Child, Mother continued her relationship with Father while Elijah remained in DCS custody. Father's abusive behavior was evident even before the Child sustained the broken bones. From Mother's testimony,

Father physically abused her both before and after she had children with him. As noted by DCS in the permanency plans, Mother "reported that [Father] beat her with a belt, choked her, and held a gun to her head." Concerning this abuse, Mother testified:

> Q. And would any of those [*i.e.*, Father beating Mother with a belt, choking her, and holding a gun to her head] have been prior to Elijah's birth?
> A. Yeah, it was prior to Elijah's birth. . . . I said it was prior to Elijah's birth . . . .
> Q. So, when you're talking about being beat with belt and being choked and having a gun held to your head, I'm trying to understand—
> A. That was before I had Elijah.
>
> ***
>
> Q. Because I think your testimony previously was there wasn't any domestic violence before Elijah.
> A. I said there wasn't any during, when I was pregnant with him. You asked me
> Q. Right.
> A. — did he put his hands on me while I was pregnant.
> Q. And I asked you before as well, and you said no. You're saying now that those incidents occurred before Elijah was born?
> A. Yesterday, when we talked, you asked me have [sic] he ever put his hands on me. I told you yes. You said was it while I was pregnant with Elijah. I said, no, he has never put his hands on me when I was pregnant with either of the kids.
> Q. So, these incidents you're talking about was before you were pregnant with Elijah?
> A. Right.
> Q. And then nothing during your pregnancy?
> A. No.
> Q. And then things happened after Elijah was born?
> A. Yeah.

Despite the physical abuse, which included Father holding a gun to her head, Mother continued to see him and even had another child with him. After this second child was born, Father was again arrested for domestic violence against Mother; this time with their daughter in the car. Trial Exhibit 35 is an arrest warrant for Father (on charges of domestic abuse) that was issued by the Criminal Court of Shelby County on July 2, 2018. According to the responding officer's affidavit of complaint:

On 07/02/2018 at 19:49 hours, [Deputies] responded to a Simple Assault/DV at [address]. Upon arrival, deputies spoke with victim [*i.e.*, Mother]. Victim advised that her and her boyfriend [Father] were in a verbal altercation due to her not wanting to give him $5 dollars. Victim advised after refusing to give defendant [Father] the $5 dollars several times, he then became very upset. Victim advised as they arrived back to the above address the verbal altercation then became physical. Victim advised that she was in the rear of a Red Nissan Altima [] driving with their daughter [*i.e.* the daughter born to Mother and Father approximately one year after Elijah] when [Father] then began to physically assault [Mother] by hitting on the top left side of her forehead. Victim advised [Father] then exited the vehicle and began to pull her by her hair and kick her as well. Victim then advised [Father] exited the vehicle and walked off from the above location while she was still inside of the vehicle with their daughter. Victim advised several minutes had passed when [Father] arrived back on scene with a metal object in his hand. Victim advised once [Father] was back on scene, the verbal altercation ensued again at which time [Father] broke the rear window of the Red Nissan Altima with the metal object . . . .

Concerning this incident, Mother testified:

> Q. So, this affidavit [of complaint, *supra*] is dated July the 2nd of 2018?
> A. Uh-huh.
> Q. So, this would have been a year and five months after Elijah was born?
> A. Right.
> Q. Okay. And tell me what happened that caused an arrest warrant to be issued in this case for [Father].
> A. [Father] got arrested this day. . . . we end [sic] up getting into it and having words, he end up hitting me, and I called the police.
> Q. He ended up hitting you what?
> A. He ended up hitting me, and I called the police.
> Q. And where did this occur?
> A. . . . [W]e was [sic] on our way back to my aunt's house. We had just left from getting our daughter['s] ears pierced.
> Q. So, y'all were in the car together?
> A. Right.
>
> ***
>
> Q. And the two of y'all got into an argument?
> A. Right.
> Q. And based upon this affidavit, it states that [Father] began to physically assault you by hitting you on the top left side of your forehead, and that he

- 24 -

got out of the vehicle, pulled on your hair, kicked you, and then he came back and he broke the window out of the car?

A. Right.

Q. You were still in the car?

A. Right.

Despite the foregoing testimony, wherein Mother admits that Father was violent toward her, was involved in gang activity, accrued criminal charges, and attacked her in a vehicle with her baby daughter present, at the hearing on the petition to terminate her parental rights, she still defended her decision to stay in a relationship with Father and maintained her belief that neither of her children was in danger:

Q. So, you stayed with [Father] past the adjudication date, the trial date for the dependency and neglect in Juvenile Court. Is that right? . . . . You were still with [Father] at that point?

A. Yes.

Q. So, at that point you knew that the breaks were non-accidental trauma; right?

A. Right. I never . . . . I never thought that was accident. I never though that [] [the Child's] leg was accidentally broke [sic]. I just never knew who hurt him. . . .

Q. You said you never thought that the dad would hurt him?

A. I didn't think so.

Q. He hurt you; right?

A. I'm not his child. That's his flesh and blood, I didn't think that he would hurt a baby.

Q. He was in a gang. That's a lot of violence in gangs, isn't it?

A. I didn't think that he'd hurt his baby.

Q. Is there violence in gangs?

A. Right. But I didn't think that he would hurt a child or hurt his hurt his own child at that.

Q. But you knew he was a violent individual?

A. But I still didn't think that he would hurt his child.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

Q. Even after the [C]hild was hurt, you never thought dad might have done that?

A. I didn't know who did it. No.

Q. Do you think he hurt your daughter by breaking out the window with the daughter in the car?

A. My daughter['s] never been hurt.

Q. So, there's glass coming in there?

A. She's never been hurt. Never had any injuries.

Q. She saw that between her parents.
A. She's never been hurt.
Q. –and that didn't harm her at all?
A. She's never been hurt.
Q. There was no harm to her from seeing y'all fight and you getting dragged out of the car, glass getting broken in?
A. It was harm with her seeing it, but she's never been—she's never been hurt. She's never had any injury, never had a hospital stay, none of that.

As set out in its order, the trial court found Mother's testimony "that she did not have any safety concerns about [Father] being around Elijah . . ." not to be credible. As previously noted, "[w]hen the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility," **In re M.L.P.**, 228 S.W.3d at 143, and "[w]e will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it." **Id.**

Even without the trial court's credibility finding, the foregoing evidence provides clear and convincing proof to support its findings that: (1) "[Father] was a person of violent and unrestrained brutal intent and action, particularly toward Elijah, whom he objectified and against whom he expressed a death wish"; (2) "[Mother] continued in her relationship with [Father] with full knowledge of his violent and unrestrained brutal intent toward Elijah, thereby exposing Elijah to the risk of physical abuse by [Father]"; (3) "[Mother] was complicit in exposing Elijah to the physical brutality that he suffered"; and (4) despite her young age, "[Mother's] conduct [was] unnatural and less than is reasonably expected of a mother, who should have the instinct to protect her child from severe and life-threatening abuse, such as is evident here." In short, there is clear and convincing proof that Mother's failure to protect Elijah was "knowing." As the **Markus E.** Court explained, "'protect' includes not only defending but also guarding against danger, *i.e.*, risk of future injury. The phrase 'failure to protect' is forward-looking. . . ." 671 S.W.3d at 461. Here, the record shows that Mother was "not only aware[] of abuse or neglect that ha[d] occurred, but [she was] also aware[] of facts, circumstances, or information indicating that the [C]hild [was] at risk or in danger of suffering abuse or neglect [if he was around Father]." **Id.** Before the Child was born, Mother was the victim of Father's physical abuse. Furthermore, she knew of Father's gang affiliation and of his criminal record. After the Child was born, Mother brought him around Father, left him unattended with Father, and the Child suffered severe injuries. From the LeBonheur CARE team, Mother knew that Elijah's injuries were non-accidental and the result of "blunt force trauma," yet she stayed in a relationship with Father and allowed the Child to be around him. Even after Father sent text messages threatening the Child to the point of death, Mother remained with him and had another child. Only after Father physically assaulted Mother and placed their daughter in harm by breaking a car window while the child was in the vehicle did Mother finally break off her relationship with Father. As the **Markus E.** Court noted, "'A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously

- 26 -

disregards.'" ***In re Markus E.***, 671 S.W.3d at 462 (quoting ***In re P.N.T.***, 580 S.W.3d at 355). Indeed, "[p]ersons act 'knowingly' when they have specific reason to know the relevant facts and circumstances but deliberately ignore them." ***In re R.C.P.***, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7-*8 (Tenn. Ct. App. July 13, 2004) ("[T]he record contains evidence that proves clearly and convincingly that M.A.F. deliberately and recklessly disregarded the information she had regarding B.J.'s prurient interest in sex that made it likely that he would sexually abuse R.C.P."). Here, it is clear that Mother was aware of facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the [C]hild, and yet she failed to act. Accordingly, we affirm the trial court's termination of her parental rights on the ground of severe child abuse. ***In re Markus E.***, 671 S.W.3d at 471; *see also* ***In re H.L.F.***, 297 S.W.3d 223, 237 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. June 15, 2009) ("By deliberately and recklessly ignoring Father's pedophilic interests, Mother knowingly failed to protect Heather from being raped by Father. . . ."); ***In re Jaycee W.***, No. M2012-00524-COA-R3-JV, 2013 WL 776218, at *6 (Tenn. Ct. App. Feb. 27, 2013) ("Mother knew Father was violent . . . . Father pushed, shoved, and hit Mother multiple times . . . . Father punched multiple holes in the walls of the family's home . . . . Mother's position that there were no signs to indicate that [f]ather had severely abused the [c]hild or that severe child abuse by [f]ather was highly probable to occur is wholly unpersuasive."); ***State v. MW***, No. E2003-00325-COA-R3-CV, 2003 WL 22668845, at *1 (Tenn. Ct. App. Nov. 2, 2003) (affirming the trial court's termination of mother's parental rights on the ground of severe child abuse where "mother knew she was in an abusive relationship, and given all of these facts, mother clearly knew and knowingly exposed the child to abuse and failed to protect him from abuse that likely could cause him great bodily harm or death.").

## B. Abandonment by Failure to Support

Although only one ground for termination must be found by clear and convincing evidence, Foster Mother has asked us to review whether the trial court erred in finding that she failed to meet her burden of proof to show that Mother abandoned the Child by failure to support. In the interest of full adjudication, we will briefly address the trial court's findings on this ground, which is found at Tennessee Code Annotated section 36-1-113(g)(1). In determining whether abandonment has occurred, Tennessee Code Annotated section 36-1-113(g)(1) directs us to Tennessee Code Annotated section 36-1-102(1)(A)(i). At the time of the filing of the petition to terminate Mother's parental rights, Tennessee Code Annotated section 36-1-102(1)(A)(i) defined "abandonment," in relevant part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have

failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, the relevant four-month period is from March 16, 2020, to July 16, 2020.  A failure to support is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(D). "Token support" means "that the support, under the circumstances of the individual case, is insignificant given the parent's means."  Tenn. Code Ann. § 36-1-102(1)(B). Because "token support" is determined in light of the parent's ability to pay, whether support payments are token requires considerable proof of the parent's financial circumstances. In the context of token support, the word connotes both income and available resources for the payment of debt. *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 n. 24 (Tenn. Ct. App. June 3, 2003).  A parent may raise as an affirmative defense that the failure to provide more than token support was not willful. As set out in Tennessee Code Annotated section 36-1-102(1)(I):

> [I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure.

Tenn. Code Ann. § 36-1-102(1)(I) (eff. Mar. 6, 2020, to June 30, 2021).  As correctly noted by the trial court, Mother "did not plead the defense of lack of willfulness in her answer or otherwise. As such, Mother waived the absence of willfulness as a defense to the ground of abandonment by failure to support. *See* Tenn. R. Civ. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also **In re Ashlynn H.**,* No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (finding that a parent who failed to plead the absence of willfulness in his response to the petition to terminate parental rights waived it as a defense to the ground of abandonment by failure to support).   This Court has previously clarified that "[a]lthough related, the concept of 'token support' is distinct from the concept of 'willfulness' in failing to support. The parent bears the burden of proving that a failure to support was not willful." ***In re Josiah T.,*** No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 n.6 (citing Tenn. Code Ann. § 36-1-102(1)(I)). Here, Mother has waived the opportunity to show that any failure to support was not willful.  However, Mother's waiver of this defense does not relieve Foster Mother from her burden to prove that the clothes, toys, and gifts Mother purchased for the Child constitute only token support.  As the trial court succinctly stated in its order, "[a]lthough [in the absence of the affirmative defense] petitioning parties such as [Foster Mother] no longer bear the burden of proving that the respondent parent 'willfully' failed to provide support, the petitioner must still present evidence of the parent's means when

alleging that the support provided was merely 'token.'" From our review, we agree with the trial court's conclusion that Foster Mother failed to meet this burden.

Turning to the record, it is undisputed that Mother provided no monetary support payments. However, under the permanency plans, Mother was required to "[p]rovide financial support in the form of good-faith payment, clothes, gifts, etc. for Elijah." As noted by the trial court, both Cherylin Yancey, the Child's DCS Family Services Worker, and Mother testified, without dispute, that Mother provided toys and clothing for the Child throughout these proceedings. Mother gave the Child Christmas and birthday gifts and provided snacks, food, and clothing. What is missing from the record is any itemization or cost of the items Mother provided. However, as correctly explained by the trial court, it was not Mother's burden to show that the items she provided constituted more than token support; it was Foster Mother's burden to show that they did not. In determining that Foster Mother failed to meet this burden, the trial court found that:

> 11. The testimony at trial was that Ms. Yanc[e]y and [Mother]testified that [Mother] provided unspecified clothes and gifts to Elijah during the Determinative Period. Neither [Mother] nor Ms. Yanc[e]y, on behalf of DCS, produced any records of the monetary value of those clothes and gifts.
> 12. According to the statute, "'token support means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B) . . . . A parent's means includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013). Furthermore, "[d]etermining a parent's available income and expenses is crucial for determining whether support is 'token.'" *In re Madison J.*, No. M2019-01188-COA-R3-PT, 2020 WL 4279791, at *7 (Tenn. Ct. App. July 24, 2020).
> 13. The record reflects that [Mother] worked at Backyard Burger during the Determinative Period, earning approximately $600.00 per month, received $353.00 per month in SNAP benefits, owned an automobile, and paid no rent . . . . The Court finds that the proof established that [Mother] was gainfully employed throughout the Determinative Period and had sufficient gross income by which she was able to provide financial support to Elijah.
> 14. However, [Foster Mother] maintained the burden to prove that [Mother's] provision of clothes and gifts to Elijah during his visits during the Determinative Period constituted a token amount. [Foster Mother] failed to carry that burden by establishing the value of the clothes and gifts provided to Elijah. [Foster Mother] failed to prove by clear and convincing evidence that [Mother] abandoned Elijah during the Determinative Period pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(ii) due to failure to support.

We agree with the trial court's analysis and conclusion. Here, we have undisputed

testimony that Mother provided clothing, toys, and other items for the Child (as required under the permanency plans), but we do not know the exact nature, quantity, value, or cost of the items.  In the absence of such proof, which was Foster Mother's burden to produce, we agree with the trial court that she failed to meet her burden on this ground.

## V. Best Interest

Having affirmed the ground of severe child abuse, we turn to review the trial court's finding that termination of Mother's parental rights is in the Child's best interest. When the petition was filed, Tennessee Code Annotated section 36-1-113(i) provided the following, non-exclusive list of factors for the court to apply in determining whether termination of a parent's rights is in the best interest of the child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (eff. March 6, 2020, to April 21, 2021).  The statute requires the court to consider "all relevant and child-centered factors applicable to the particular

case[.]" Whether termination of parental rights is in a child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]'" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Accordingly, some factors may weigh more heavily than others under the circumstances surrounding the particular child and parent. *Id.* (quotation omitted). Indeed, the trial court "may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *Id.* (citation omitted).

As noted above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. *In re Taylor B.W.*, 397 S.W.3d 105, 112-113 (Tenn. 2013). We will affirm the trial court's factual findings unless they are unsupported by a preponderance of the evidence. *In re Neveah M.*, 614 S.W.3d at 674 (citations omitted). Whether the court's factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. *Id.* (citations omitted).

In its final order, the trial court considered the foregoing factors and made the following findings:

> (1) Although [Mother] apparently has made significant adjustments of circumstances, conduct and conditions so that now she has a much more stable lifestyle, the lengthy time it took her to be able to maintain such stability (over three (3) years after Elijah went into the protective custody of DCS) has caused there to be such a strong, secure and loving bond between Elijah and [his foster parents] that it would not be in Elijah's best interest to break that bond. . . .
> (2) From the time Elijah was placed into protective custody, it took over three (3) years for [Mother] to make significant lasting adjustments after reasonable efforts by DCS to assist her in making adjustments. Although it appears that [Mother] is maintaining positive lasting adjustments, it further appears that such adjustments do not override the significant trauma that Elijah will experience if he were removed from the [foster home].
> (3) [Mother] is maintaining regular visitation with Elijah. . . .
> (4) [Mother] reportedly is establishing a meaningful relationship with Elijah. . . .
> (5) Due to the very strong, stable, secure and loving bond that has been established and developed over eight (8) years between Elijah and [his foster

family] a change of caretakers and physical environment would have significant traumatic effects on Elijah's emotional and psychological condition.

(6) [Father] has shown brutality and physical abuse and neglect towards Elijah. He has also demonstrated brutality and psychological and emotional abuse toward [Mother]. [Mother] was complicit in the physical abuse of Elijah when he was an infant. She knew of [Father's] violent tendencies that could be a threat to Elijah, and she did not make any reasonable efforts to protect Elijah from physical harm when he was an infant.

(7) The physical environment of the current home of [Mother] is healthy and safe. However, the Court has concerns that marijuana is likely being used by those who are in the home and around Elijah when he is in the home visiting with [Mother] that may cause safety and stability issues. . . .

(8) Although [Mother's] mental and emotional status contributed to the removal of Elijah from her home and delayed Elijah being able to have unsupervised visits with [Mother] for three years after he came into the protective custody of DCS, [Mother's] mental and emotional status is stable.
. . .

(9) [Mother] has not paid child support consistent with the child support guidelines established under Tenn. Code Ann. § 36-5-101. . . .

The record supports the trial court's findings. Like the trial court, we acknowledge that Mother has made great strides to improve her situation. As noted above, Mother has been compliant with the majority of the requirements under the permanency plans. She has exercised visits with the Child; he recognizes her as his parent, and there is some bond between the two. However, Elijah was only three months old when he came to live with Foster Mother; he will be nine this year. The trial court's best interest analysis focuses primarily on factor five, *i.e.* "The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." As noted above, the trial court "may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *In re Neveah M.*, 614 S.W.3d at 679 (citation omitted). Given the fact that Elijah was an infant when he came into Foster Mother's custody, he has no memory of any home but hers. Although the length of this custodial episode cannot be blamed entirely on Mother, as found by trial court, "[f]rom the time Elijah was placed into protective custody, it took over three (3) years for [Mother] to make significant lasting adjustments after reasonable efforts by DCS to assist her in making adjustments." Indeed, as discussed in detail above, Mother maintained her relationship with Father for most of the first two years that the Child was in DCS custody, and this decision extended the custodial episode. The record shows that, while Mother continued her relationship with Father, Elijah formed a strong parental attachment to Foster Mother. That bond has only deepened in the last eight years he has been in the foster home.

The Child's bond with Foster Mother is apparent. Throughout the custodial episode, he struggled with leaving Foster Mother to go with Mother for visits. As Foster Mother testified, during drop offs: "He couldn't be consoled. He was just crying and no one could calm him down"; "He was kicking and screaming and withdrawn and saying, 'No, no, no.' I mean, he—it was very clear [] that he [] didn't want to go [to Mother]." Ms. Yancey was present at several of the drop offs. She observed that:

> Elijah became very quiet as [Mother] was putting him in the car seat, Elijah had a blank stare, and he began reaching for [Foster Mother], began calling out "Mommy" to [Foster Mother]. . . . When they returned [from visits with Mother], Elijah smiled when he saw [Foster Mother]. He extended his arms towards [Foster Mother]. And when [Foster Mother] picked him up, he hugged her around the neck.

According to the testimony, for approximately nine months after Mother was granted unsupervised, in-person visits, the Child experienced night terrors, which primarily occurred on nights he returned from visits with Mother. DCS arranged a sleep study. Foster Mother testified the study revealed that Elijah's night terrors were "stress-related." This testimony is undisputed.

Although the night terrors ultimately subsided, and the Child got more comfortable with drop-offs, according to Ms. Yancey's testimony, he began to demonstrate other troubling behaviors that indicate a level of anxiety:

> [The Child] did, you know, he did cry during the handoff. And, then, as [visits] progressed, . . . I could be sitting there talking to Elijah in the parking lot and when [Mother] pulls up and [Foster Mother] takes him out [of] the car seat, you know, [Mother] will come . . . to meet, to get him. And you could see, you know, Elijah—it's like—almost like this kid can't be happy . . . . [I]t's almost like he's struggling when he don't [sic] want to hurt anybody's feelings. If he's—like, if he goes over here and, "Hey, Mom," this, he's looking back to see what [Foster Mother] is going to do. When he's, you know, showing love to [Foster Mother], it's almost like he's looking to see what [Mother] is going to do. And it's—it's sad that it's been so long.

We agree. It is not in this Child's best interest to continue to be torn between Foster Mother and Mother. After almost nine years in DCS' custody, it is time for Elijah to have full integration into a stable and loving home. From the record, Foster Mother's home best fulfills these criteria. Ms. Yancey testified that, "[Foster Mother] is mother. She's been mom to him. She's been a good mom to him." During her testimony, Mother conceded this point:

> Q. How do you think—you believe Elijah has been taken care of with [Foster

Mother]?
A. I believe [Foster Mother has] done a good job with my son.

The Child's bond with Foster Mother clearly indicates that he feels safe and secure in her home. Meanwhile, the safety of Mother's home is not as clear. Foster Mother expressed concern that the Child often returned from Mother's home smelling of marijuana. Foster Mother also expressed concern that the Child was hungry and not clean when he returned from visits with Mother. Mother denied these concerns, but there is enough in the record to justify the trial court's concern "that marijuana is likely being used by those who are in the home and around Elijah when he is in the home visiting with [Mother] that may cause safety and stability issues." From the foregoing, we agree with the trial court that "[d]ue to the very strong, stable, secure and loving bond that has been established and developed over eight (8) years between Elijah and [his foster family] a change of caretakers and physical environment would have significant traumatic effects on Elijah's emotional and psychological condition." Continuation of the parent/child relationship will only cause the Child more anxiety and confusion and will further delay his full integration into the only home he has ever known. From our review, we conclude that the preponderance of the evidence supports the trial court's findings as to the statutory best-interest factors, and the cumulative weight of those findings amounts to clear and convincing evidence that termination of Mother's parental rights is in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, the trial court's order terminating Appellant/Mother's parental rights to the Child is affirmed. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Tarrinae L. R. Because Tarrinae L. R. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.


    s/ Roy B. Morgan, Jr.
ROY B. MORGAN, JR., SENIOR JUDGE